In the Matter of DAVID F. VALERIO, Appellant, v THOMAS F. HASTINGS, as Chief of Police of the City of Rochester, Respondent.

Fourth Department, May 23, 1980

**APPEARANCES OF COUNSEL**

*William A. Muoio* for appellant.

*Louis N. Kash, Corporation Counsel (Barry C. Watkins* of counsel), for respondent.

## OPINION OF THE COURT

SCHNEPP, J.

This is a CPLR article 78 proceeding to review a determination by Thomas F. Hastings, Chief of the Rochester City Police Department, which denied petitioner's application to renew an amusement center license at D. J.'s Bar at 1700 Clifford Avenue, Rochester, New York.

The record reflects that petitioner was issued an amusement center license for his premises on July 19, 1979 and filed the renewal application on July 30, 1979.[1] In a letter dated August 28, 1979 respondent informed petitioner that his application for the license had been denied. Respondent provided the following reasons for the denial: "On July 28, 1978 you failed to report an incident involving an assault with a gun that happened at 1700 Clifford Avenue. On a followup investigation you did tell the officers you knew nothing about the incident. Further, the suspect named in the assault was one Thomas Taylor who has been frequenting your premises at 1700 Clifford Avenue; along with persons involved in organized gambling in the City of Rochester." Respondent thereafter designated a hearing officer to review the denial of petitioner's application and a hearing was conducted on November 1, 1979.[2] At the hearing, petitioner was advised that under the ordinance he could "offer evidence why the application should be reconsidered". Police Officers Donald Bunce and Merritt Rahn and petitioner testified. In a letter dated November 28, 1979 and addressed to petitioner, respondent made certain findings of fact which supported his August 28, 1979 statement as to the reasons for the denial of the application and concluded as follows:

---

1. All amusement center licenses expire on July 31 after their date of issuance by operation of law (Rochester City Code, § 29-5). We noted that chapter 29 of the Rochester City Code was repealed by Ordinance No. 79-679 adopted by the Rochester City Council on December 27, 1979 and replaced by a new chapter 29. All references to the code in this opinion are to the provisions in effect at the time these proceedings were instituted (prior to the adoption of Ordinance No. 79-679).

2. Under sections 29-14 and 68-10 of the Rochester City Code licenses may be revoked or suspended after a hearing. Since this is a renewal application, no formal hearing was required *(Matter of Hirsch v Hastings,* 70 AD2d 1052, 1053; *Carroll v Hastings,* 64 AD2d 843; *Matter of Neshaminy, Inc. v Hastings,* 64 AD2d 830).

"There is nothing in the record that relates to you, Mr. Valerio, not being of good moral character and is not at issue in this matter. What is in issue is, can you maintain good order within your premsies at 1700 Clifford Avenue.

"Based on the record and the testimony of Officer Rahn, there are, in the opinion of the Hearing Officer, coercive influences which seem to intimidate your ability to insure a high degree of supervision to maintain the good order that is required by the statute.

"Therefore, it was the recommendation of the Hearing Officer that the denial be continued and the Office of the Chief of Police has concurred with the recommendation."

In this proceeding petitioner contends that only one instance of disorder occurred on his premises and that the denial of the license was arbitrary and capricious and constituted an abuse of discretion.

Section 29-2 of the Code of the City of Rochester provides: "No person shall maintain or operate an amusement center without first having obtained a license to do so from the Commissioner of Police and the licensee shall be of good moral character and shall maintain good order therein." An amusement center is defined as "any indoor place in which is maintained or operated for the amusement * * * of the public, any coin-controlled amusement device of any description" (Rochester City Code, § 29-1).[3]

Under established rules the application for a renewal is treated in the same manner as an application for a new license and the " 'inquiry [of the court] is limited to a determination whether the record discloses circumstances which leave no possible scope for the reasonable exercise of that discretion' *(Matter of Stracquadanio v Department of Health,* 285 NY 93, 95, 96)" *Matter of Hirsch v Hastings,* 70 AD2d 1052, 1053; see, also, *Matter of Wager v State Liq. Auth.,* 4 NY2d 465, 468). " '[T]he test of the legality of the exercise of the discretionary power is solely whether the agency acted arbitrarily or capriciously' " *(Matter of Hirsch v Hastings, supra,* p 1053, quoting *Matter of Wager v State Liq. Auth., supra,* p 468).

■ We conclude that the grounds for respondent's action are inadequate and improper and that his determination must be annulled.

The standard to be applied by respondent in reviewing

---

3. Petitioner maintained a coin-operated pool table on his premises.

petitioner's application is specified in the code; the focus of respondent's concern is limited to the question of whether the licensee is "of good moral character and shall maintain good order [in the amusement center]" (Rochester City Code, § 29-2). As noted above, respondent concedes that the question of petitioner's "moral character" is not in issue here. Thus, we are concerned solely with whether the record contains sufficient evidence to support the reasonableness of respondent's exercise of his discretion to deny the application based on his finding that the petitioner could not maintain good order at his premises.

Chief Hastings' opinion that petitioner could not "insure a high degree of supervision to maintain the good order" was apparently based upon an incident which occurred at petitioner's bar on July 28, 1979 involving Thomas Taylor, a reputed member of organized crime, which petitioner failed to report to the police. (At this juncture, we note that "a high degree of supervision", is not a standard described in the code [see Rochester City Code, § 29-2].) According to the police, Taylor "pistol-whipped" Alex Lappetito during an argument at D. J.'s Bar. In a police report dated August 29, 1979 Lappetito alleged that he was hit on the head with a small handgun and was knocked unconscious. The police report also notes an interview with petitioner, the owner of D. J.'s Bar: "He was interviewed by Officer Loray and he [petitioner] stated that he was not there at the time of the incident and stated that he did not know anything about the incident". At the hearing, petitioner made the following admission: "I was there when it happened. I didn't know it happened until after it happened. It happened so fast. I told [Detective] Bunce that I didn't want any trouble.[4] I was afraid to have any trouble in the place I just opened * * * [a]nd I admitted to not telling the officer the truth, and I told him the reasons why. I didn't want any trouble * * * [a]s far as Tom Taylor goes, I told him I didn't want him to come in the joint causing any trouble. You know I don't want any trouble in the place, and he hasn't caused trouble. He's been in. I didn't know it, during the day while I wasn't there. And he's been in at night. He has a few drinks and talks to his friends, and he leaves."

Officer Rahn testified that a confidential source had in-

4. Petitioner accepted the invitation accorded in the letter of August 28, 1979 to speak to the police concerning the denial of his application and apparently made these statements when he met with Officers Rahn and Bunce on September 4, 1979.

formed the police that on September 19, 1979 Taylor and Lappetito again had an argument at D. J.'s Bar. Taylor allegedly slapped Lappetito and Lappetito then punched Taylor in the face, following which patrons of the bar broke up the fight. At the hearing, petitioner denied that the September incident occurred. He stated, "I don't think that statement is true. Alex Lappetito hasn't stepped foot in that place [D. J.'s Bar] since it [the July incident] happened * * * [T]here hasn't been any incident since the date that it happened".

In support of his position, petitioner made the following statement at the hearing: "As far as my life, I think I been a pretty good person. Never involved in any crimes. I don't have any record. And I want to run a decent business there. For one incident that happened, you know, okay, it was my fault. Like I wasn't on top of it. I did deny seeing it. I told Detective Bunce I was scared. I didn't want any trouble in the place. But I think this is totally unfair to me as a businessman to be harassed like this. Because there hasn't been any other incidents in my place."

It is apparent that petitioner had no warning of the impending assault on July 28, 1979 and could not have prevented its occurrence; the altercation between Taylor and Lappetito erupted and ended quickly. A single incident, in any event, is not evidence that one is unable to maintain good order at his bar. As the court in *Matter of Stanwood United v O'Connell* (283 App Div 79, 82, affd 306 NY 749) stated: "Suffering premises to become disorderly means something more than a mere happening on one occasion. A finding that the management knowingly allowed such things to occur and to continue would have to be bottomed upon a showing either of more than a single event or the showing of a demonstrated attitude toward that happening which indicated acquiescence" (see, also, *Italiano v Liquor Auth. of State of N. Y.,* 59 AD2d 820; *Matter of Chipman Assoc. v New York State Liq. Auth.,* 47 AD2d 585). This one incident between Taylor and Lappetito at D. J.'s Bar does not establish that petitioner could not "maintain good order therein" (Rochester City Code, § 29-2). There is no proof that he knowingly permitted the altercation to occur or continue. Moreover, the fact that petitioner did not inform the police of the incident does not demonstrate an "attitude toward the happening which indicated acquiescence" *(Matter of Stanwood United v O'Connell,* 283 App Div 79, 82, *supra).* As petitioner stated, "I was scared. I didn't want any trouble

in the place". Petitioner testified that he has called the police when trouble has broken out in his establishment and that "[i]f anybody causes trouble in my place, I will call the police * * * [e]ven if it involves Taylor. I don't care who it is * * * I told Taylor I didn't want him in there if he is going to cause any trouble."

██ ██ The hearsay testimony at the hearing of the alleged second incident between Taylor and Lappetito on September 14, 1979 was denied by petitioner and remains unsupported by any legal evidence. While hearsay may be received in an administrative hearing, it may not "form the sole basis for the ultimate determination * * * More is required. There must be a 'residuum of legal evidence' *(Matter of Carroll v Knickerbocker Ice Co.,* [218 NY 435, 440])." *(Matter of Roewer v Melton,* 62 AD2d 1120.) Here, apart from this hearsay evidence, there is no proof that an altercation occurred in September, 1979. Thus, this hearsay testimony cannot be utilized to support in whole or part respondent's finding that "coercive influences * * * intimidate [the petitioner's] ability to * * * maintain * * * good order".

██ It is apparent that the police were "reaching" to find a basis to deny petitioner his license. The focus of the police's concern was that known members of organized crime and gambling were frequenting petitioner's establishment. A large portion of the hearing was devoted to cataloging the appearance of various alleged members of organized crime at D' J.'s Bar. Although these persons may be undesirable, their mere presence at petitioner's establishment has nothing to do with the propriety of issuing an amusement license to petitioner. The July, 1979 incident supplied the police with the excuse to deny petitioner's application for a license. While it may be inferred from petitioner's failure to report the July, 1979 incident and tell the truth that he was intimidated by the organized crime figures, to conclude from this behavior that petitioner thereby lacked the ability to maintain good order in the bar is pure speculation. Indeed, one can infer from the record that petitioner can maintain good order on his premises because of the failure of respondent to produce competent evidence of any other disturbance.

In brief, the record simply does not support respondent's action; he abused his discretion and acted arbitrarily and capriciously in denying petitioner's application.

Accordingly, the judgment confirming respondent's determi-

nation should be reversed and annulled and the matter remitted to respondent with the direction to issue the amusement center license to petitioner.

HANCOCK, JR., J. P., CALLAHAN, DOERR and WITMER, JJ., concur.

Judgment unanimously reversed, without costs and petition granted in accordance with opinion by SCHNEPP, J.